UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 10-187 (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT AMINA ALI |
| v. | ) | SENTENCING MEMORANDUM |
| | ) | |
| AMINA FARAH ALI, | ) | |
| | ) | |
| Defendant. | ) | |

**A.  The Sentencing Guidelines Do Not Rationally Reflect The Offense**

No matter the facts or the law, the guidelines are the same – 30 years to life.   If Mrs. Ali was convicted of one offense – like her co-defendant – the maximum sentence is fifteen years, but the guidelines are 30 years to life, double the maximum penalty allowed by law. If the Defendant gives one dollar or one million dollars to a foreign terrorist organization, the guidelines are the same – 30 years to life.   If the Defendant has never been in trouble with the law the guidelines are 30 years to life.   If the Defendant has spent a life of crime the guidelines are the same – 30 years to life.   In fact, any tangible support, even if for humanitarian purposes, is 30 years to life.

Section 2M5.3 provides an increase of two levels if the offense involved the provision of dangerous weapons, explosives or the provision of funds to obtain the same. The result of that enhancement – 30 years to life – is no different.   The terrorism enhancement, Section 3A1.4, which the probation office has found to apply, has an upward departure provision.   What an upward departure from life might be is undefined.

The point that the Defendant makes is that the Sentencing Commission has abandoned its role to consider among other factors: the maximum penalty of the offense (grade of the offense), the circumstances under which the offense was committed which might mitigate or aggravate the offense, and the nature and degree of the harm caused by the offense. See 28 U.S.C. § 994(c).  This author cannot blame them, to do otherwise would open up the Commission to charges of being soft on the enemies of America. Far better to punt any criticism downstream.

In *Nelson v. United States*, 555 U.S. 350, 351 (2009) the Supreme Court reaffirmed the existing rule that a district judge "may not presume that the Guideline range is reasonable."

Judges are now invited to consider arguments that the applicable guidelines fail properly to reflect §3553(a) considerations, reflect an unsound judgment, do not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless of the stated guidelines.  *Rita v. United States*, 551 U.S. 338, 351, 357 (2007). Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks and citations omitted).

Whether a judge may draw any useful advice from a guideline depends first on whether the Commission, in promulgating or amending it, acted in "the exercise of its characteristic institutional role."  *Kimbrough*, 552 U.S. at 109.  As described in *Rita*, the exercise of this role has two basic components: (1) reliance on empirical evidence of

pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and consultation with participants in and experts on the criminal justice system.  *Rita*, 551 U.S. at 348-50.   Where a guideline was not developed based on this "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case."  *Kimbrough*, 552 U.S. at 109-10. See also *Spears v. United States*, 129 S. Ct. 840, 843-44 (2009) ("we now clarify that district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines.")

Over the past seven years, the Supreme Court has given judges the power to impose sentences that are not greater than necessary to satisfy the statutory purposes of sentencing, to consider all of the characteristics of the offender and circumstances of the offense, to reject advisory guidelines that are not based on national sentencing data and empirical research, and to serve their function in the constructive evolution of responsible guidelines. See *United States v. Booker*, 543 U.S. 220 (2005); *Rita v. United States*, 127 S. Ct. 2456 (2007); *Gall v. United States*, 128 S. Ct. 586 (2007); *Kimbrough v. United States*, 128 S. Ct. 558 (2007). The Court really means it. See *Spears v. United States*, 129 S. Ct. 840 (2009); *Nelson v. United States*, 129 S. Ct. 890 (2009) and *Pepper v. United States*, 131 S. Ct. 1229 (2011).

1. **The terrorism enhancement, §3A1.4, is not rationally applied to a violation of 18 U.S.C. § 2339B.**[4]

The first place to look is the statute. Giving material aid to a designated foreign terrorist organization in violation of 18 U.S.C § 2339B has a maximum sentence of 15 years (180 months). Subsumed within the statutory definition of the material support statute are the factors that define terrorism; that the organization has already been defined as a Foreign Terrorist Organization, that the contributor knows the designation, or in the alternative, that the contributor knows that the organization engages in terrorism; and the support is provided despite that knowledge. The offense level set by the Sentencing Commission in §2M5.3 for this offense already covers the high end of sentencing possibilities. For a first offender, the range is 63-78 months[1]. For someone with a significant prior history, with the two level enhancement involving dangerous weapons, the range is 140-175 months - near the statutory maximum.

The terrorism enhancement in §3A1.4 applies to a federal crime of terrorism, defined by looking exclusively to 18 U.S.C. § 2332b(g)(5). That statute has a two part test: 1) that the offense is for the purpose of influencing a government by coercion or intimidation; and 2) that it violates one of 50 or so listed criminal statutes. The overwhelming majority of those statutes do not relate to terrorism. They are general crimes such as protecting unauthorized access to computers (18 U.S.C. § 1030(a)(1)), or

---

[1] By contrast bank fraud, 18 U.S.C. § 1344, is a 30 year offense. The first offender guidelines for a similarly sized fraud are 4-10 months (level 9).

specific crimes of violence like the killing of a federal employee (18 U.S.C. § 1114) that can be committed for many reasons. Also contained within the list are a few terrorism related offenses, including 18 U.S.C. § 2339B. So, for the most part, the terrorism enhancement does not result in double counting for terrorist related offenses.

Unlike most of the offenses that are contained in the definition of a "federal crime of terrorism," the statutory definition of the material support statute is the same factor that defines the terrorism enhancement; the requirement that the conduct is intended to influence the conduct of a government by intimidation or coercion (contained within the definition of terrorism, see 18 U.S.C. § 2331). While the Sentencing Guidelines often result in double counting, there is usually a clear intent to do so. Here, most of the offenses listed in §2332b(g)(5) are separate offenses that do not by definition include terrorism, e.g., arson, murder, harming government buildings or vehicles, etc., so a separate enhancement for terrorism makes sense. For §2339B the separate terrorism enhancement would not add anything new to the underlying guideline.

Still, the terrorism enhancement might carry weight if the underlying guideline somehow undervalued the criminal conduct. As noted, it does not. The guideline, by itself, virtually eliminates any sentence in the bottom portion of the sentencing range set by statute and virtually assures a prison sentence out of proportion to the criminal act committed.

How did we get here? Prior to 1994, the Sentencing Guidelines did not include an enhancement for conduct relating to terrorism offenses. Instead, the Guidelines included

a policy statement that provided: "If the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range."   See former U.S.S.G. § 5K2.15.

In 1994, Congress passed the Violent Crime Control and Law Enforcement Act of 1994. Pub. L. 103-322 (1994). Under that Act, Congress directed the Sentencing Commission to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, which involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime.   Pub. L. 103-322 §120004 (1994) (emphasis supplied).

Accordingly, the Sentencing Commission deleted the upward departure policy statement and promulgated former §3A1.4, effective November 1, 1995:

> (a) If the offense is a felony that involved, or was intended to promote, international terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).   See Pub. L. 104-132.   As part of the Act, Congress directed the Sentencing Commission to "amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism **only** applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code." (Emphasis supplied). Id. §730 (1996).

Accordingly, the Sentencing Commission promulgated an emergency amendment

to §3A1.4 that replaced the term "international terrorism" with "federal crime of terrorism." The amendment was otherwise re-promulgated without change, effective November 1, 1997:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
> (b) In each case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Looking to Congressional intent, the directive from Congress was to set up a separate enhancement for terrorism for offenses, "unless such involvement or intent is itself an element of the crime." The Sentencing Commission did not follow the directive of Congress in promulgating §3A1.4. The Commission's lack of precision is perhaps understandable when Congress tried to limit the application "only" to offenses listed in 18 U.S.C. § 2332b(g)(5). That section happens to include, within a long list of other offenses, Mrs. Ali's offense, 18 U.S.C. § 2339B. But what the Commission did not follow, was the proscription not to include offenses that already related to terrorism. In other words, Congress specifically directed the Commission not to double count offenses using the terrorism enhancement. This Court should consider whether the guideline range set by the Commission is reasonable and rationally based. It appears that the terrorism enhancement for violation of §2339B offenses is not a rational classification.

Another telling observation is the decision of Congress not to raise the maximum penalty for the material support statute. The statute carries a maximum penalty of 15 years and no minimum penalty. Because it falls into Class C, probation is an allowable

term. See 18 U.S.C. §§ 3559(a)(3), 3563(a).  Counsel suggests this may reflect an understanding of the vast breadth of conduct that can run afoul of this law. See *Holder v. Humanitarian Law Project,* 130 S. Ct. 2705 (2010), humanitarian and political activities in the form of monetary contributions, other tangible aid, legal training, and political advocacy is legitimately prohibited conduct.

Therefore the rational recommendation from the Sentencing Guidelines should be Criminal History Category I, Offense Level 28, resulting in a recommendation of 78-97 months, absent any grounds for variance or departure.

**2.  The material support guidelines invite a downward departure.**

The Commentary for §2M5.3 specifically invites the Court to consider departures based upon:

> "[T]he degree to which the violation threatened a security interest of the United States, the volume of the funds or other material support or resources involved, the extent of the planning or sophistication, and whether there were multiple occurrences." (nt. 2 (A)).

Al Shabaab had just been designated a Foreign Terrorist Organization less than five months before the institution of the wiretap.  The evidence at trial showed that Mrs. Ali and others had been involved in providing support when it was legal, before the end of February, 2008.  Al Shabaab was the only non-clan based group fighting the Ethiopian invasion that began in 2006.  It was patriotic to provide support. Mrs Ali's clothing drive began in an effort to provide assistance to those who had been displaced by the invasion. What was only intimated at trial, but is obvious from the testimony, is that the so-called Transitional Federal Government (TFG) was providing no assistance to the general

8

populous of Somalia.   Any monies going to that group were being diverted to the pockets of the politicians.   There are knowledgeable commentators that have declared that the TNG/TFG were set up originally for the sole purpose of obtaining assistance from outside interests for their own self-enrichment.   Even prior to February, 2008 no one's hands were clean in Somalia.

Mrs. Ali struggled to accomplish what no one else was even attempting: providing humanitarian assistance, without profit to her, that she could confirm was reaching the needy.   The Court can recall the testimony that Mrs. Ali began this quixotic quest when she sent money she had raised to a recognized Somali charity and learned that none of it would be going to Somalia, rather it was being eaten up in administrative costs in the United States.

Mrs. Ali had no history of radicalism. She was a well-known devout Muslim, but she had no truck with Al Qaida.   Her concern was Somalia.   She was not consumed by the clan-based politics that were the downfall of Somali unity.   She is Darod, Al Shabaab is dominated by the Hawaiye clan.

The amount of money is miniscule – $8600 in 10 months, perhaps double that giving the Government the benefit of the doubt.[2]   That means Mrs. Ali raised between $900 to $1800 per month.   It can't be more.   The Government followed her every movement, her every communication, for nearly a year.[3]   If there was more funding we

---

[2]At trial the Government included money sent to Ras Kamboni in their unofficial total. That group has never been designated an FTO. In fact, the Kenyan army has collaborated with Ras Kamboni to provide assistance in its occupation of the port of Kismayo in 2013.
[3]The Government discovery suggests that they were intercepting calls for a much longer time period, closer to 18

would know it.  That was the equivalent of the funds necessary to get just one of the clothing shipments transported to Somalia ($17,000).  As the testimony showed at trial, Mrs. Ali tried to direct a significant portion of the money going through Al Shabaab to treat the wounded and to go to the widows and orphans of the fallen fighters.

Mrs. Ali sent clothing to Somalia, not the weapons of war.  Though some of the money she sent to Al Shabaab may have gone to support the wounded fighters, none of the intercepted calls suggested that the funds were ever to be used to procure arms for the conflict.

These are all factors that support a departure from the §2M5.3 guidelines.

**3. 18 U.S.C. § 3553 allows the court to set a proper sentence outside of the recommended guideline range to arrive at a sentence that is sufficient, but not greater than necessary to accomplish the goals of sentencing.**

**a.  The law of variance.**

Mrs. Ali objects to the conclusion of the presentence report (¶ 128) that there is no information to support a variance from the properly calculated sentencing guidelines.

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. *Gall v. United States*, 128 S. Ct. 586, 598 (2008), quoting *Koon v. United States*, 518 U.S. 81.

The Sentencing Guidelines are merely the starting point under the factors to be

---

months rather than the 10 months so far acknowledged. Counsel has never been told how long the wiretap actually lasted, and whether there were other wiretaps not disclosed.

considered in fashioning an appropriate sentence under 18 U.S.C. § 3553. The United

States Supreme Court in *Kimbrough v. United States*, 128 S. Ct. 558 (2008), and *Gall v.*

*United States*, 128 S. Ct. 586 (2008), dictate the imposition of a sentence "sufficient but not

greater than necessary" to achieve the statutory purposes of sentencing, after considering

the circumstances of the offense, the history and characteristics of the defendant, the kinds

of sentences available, and the need to avoid unwarranted disparities.

Beginning with *Rita v. United States*, 127 S. Ct. 2456 (2007) and continuing with

*Gall v. United States,* supra, and *Kimbrough v. United States*, supra, the Supreme Court

fleshed out the considerations for the sentencing courts in fashioning a sentence under

§3553(a) after the surgery performed upon it by the Court in *United States v. Booker*, 543

U.S. 220 (2005). In *Rita*, the Supreme Court made clear that the *"sentencing judge"* has

the statutory duty to apply the seven factors of §3553(a) to the individual facing sentence

before the court. In determining the sentence the court "may hear arguments by

prosecution or defense that the Guidelines sentence should not apply, perhaps because (as

the Guidelines themselves foresee) the case at hand falls outside the 'heartland' to which

the Commission intends individual Guidelines to apply, U.S.S.G. § 5K2.0**,** perhaps

because the Guidelines sentence itself fails properly to reflect §3553(a) considerations, or

perhaps because the case warrants a different sentence regardless." 124 S. Ct at 2465.

In *Gall and Kimbrough*, the Supreme Court addressed the question specifically left

open in *Rita,* the limits of review for sentences imposed outside the guideline range

calculated for an individual case.

11

"We reject, however, an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range. We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence.

As an initial matter, the approaches we reject come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range."

*Gall v. U.S.* 128 S. Ct at 595. As the Supreme Court noted in *Rita*, and again in *Kimbrough*, although the Sentencing Commission was entitled to come to its own conclusion on how to weigh the factors of §3553(a) in determining the guidelines, the District Court has a separate statutory duty to do the same thing with each individual defendant.

18 U.S.C. § 3553(a)(2-7) set for the list of factors the court is required to consider to determine the appropriate penalty for a law violator:

1. The nature and circumstances of the offense.

2. The history and characteristics of the defendant.

3. The need to reflect the seriousness of the offense.

4. The need to promote respect for the law.

5. The need to provide just punishment for the offense.

6. The need to afford adequate deterrence to criminal conduct.

7. The need to protect the public from further crimes of the defendant.

8. The need to provide the defendant with educational or vocational training, medical care or other correctional treatment in the most effective manner.

9. Kinds of sentences available.

10. The Sentencing guideline calculation for this case and defendant.

11. Pertinent policy statements of the Sentencing Commission.

12. The need to avoid unwarranted disparity among defendants with similar records with similar offense conduct.

13. The need to provide restitution to any victims of the offense

There is little support that the length of a sentence pays any role in specific deterrence to others. "Here, the findings are uniformly negative: there is no evidence that increases in sentence length reduces crime through deterrence." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: a review of Research, 28-29 (2006). In a study of specific deterrence, involving federal white collar offenders in the pre-guideline era, no difference in deterrence was found between probation and imprisonment. David Weisbrud, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995). Not surprisingly, studies confirm that it is the certainty of punishment, not its length which has any deterrent value. See Andrew Von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). See also "United States Sentencing Commission studies on recidivism; Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines" (May 2004), www.ussc.gov/publicat/Recidivism_General.pdf, and "Recividism and the First Offender" (May2004), www.ussc.gov/publicat/Recidivism_FirstOffender.pdf. The Sentencing Commission has discovered that lower rates of recidivism are associated with age, stable employment, marriage, nonviolent offenses, and

first offense.

**B. Mrs Ali is a refugee whose family and life were ripped apart by war. It is understandable that she wished to help deal with the fallout of the strife in Somalia**

**1. Defendant's childhood and upbringing.**

Amina Farah Ali is the second child of the union of Farah Ali Warsame and Dhuha Abdullahi Jama.[4]   She was born in Mogadishu, Somalia, in August of 1976.

Her father, now eighty-one years old, worked as a policeman from the 1960's through 1990, during the period of the Said Barre dictatorship, up through the days when Somalia still had a socialist government, and something resembling civil institutions.   He also served in the security forces, and fought in the war against Ethiopia in the late 1970's—one of Somalia's many territorial clashes with its neighbor to the west in a conflict that continues to this very day, in one form or another.

The Defendant's mother Dhuha was born a member of the nomadic, herding Somali sub-clan, the "Warsengeli," of the Ogaden,[5] who have at various times since the 1860's been colonial protectorates of the Kingdom of Italy (and later the Mussolini regime); of the British throne; and today, of Ethiopian rule.   Both Amina's parents are members of the Darod clan group—by some accounts, the largest of three major demographic Somali

---

[4] Women in Somali culture traditionally carry a patronymic formed from their father's given name and hereditary cognomen, and retain this name even after marriage.

[5] The Ogaden is a vast grasslands area officially part of Somalia until 1945; Great Britain assumed effective control of fascist Italy's colonies in Italian East Africa in 1941, including Italian Somaliland, under a UN mandate at the end of World War II, and administered the post-war setting along with its own colonies in British Somaliland and Kenya. In 1948, for geopolitical advantage, Britain unilaterally "ceded" Ogaden to the Kingdom of Ethiopia, leading to political and social disruption of the nomadic life of tens of thousands of Somali herdsmen still living a traditional lifestyle, with repercussions of the cross-border animosity to be played out to the present day.

bloodlines;[6]  Amina believes her mother came from the northeast of the nomadic zone, while her father hails from a farming town in the middle of the country, near Lasa Nod. Dhuha—who passed away last fall—met her husband Farah Ali in Mogadishu sometime in the late 1960's.  As with almost ninety-nine percent of Somalia, her parents are both Muslims of very devout backgrounds.

Amina was the third child born to her mother, who had seven children with Farah Ali Warsame[7].  Following the couple's divorce around 1980, Dhuha would re-marry, and she had her eighth child in 1984.  Her second husband died in the civil war a few years later.  Amina's parents split up for reasons that are not clear—as part of the divorce separation Amina remained in her father's custody, as was customary in Somali culture. Her father would remarry in Mogadishu, and have more children.  As part of his policeman's assignment, he was sent to the town of Bunco,[8] on the northern side of the Horn of Africa, and far from anywhere Dhuha had ever been.

As a policeman and security force reservist, Amina's father Farah Ali fought at some point in the Ogaden War, as Somalia attempted to wrest its former territory back from Ethiopia, succeeding in its initial military campaign.   The socialist military regime of Siad Barre broke off abruptly from Soviet sponsorship at the start of the 80's, when the Soviets embraced the new Marxist government in Ethiopia and sent troops to support

---

[6] A Canadian survey of Somali demography in the late 1990's cited Darod as the largest clan, while the Central Intelligence Agency reported in 2002 that the Hawiye clan numbers more members.   A third clan, Issak, comprises the other large group of sub-clans and families.

[7] Her siblings Adam, Fadima and Hussein are all older ranging in age from 37 to 40 years old; her younger brothers Jamal and Hakim, and her sister Shukreet, range in age from 30 to 34.    Amina's half-sister Abdiwalli was born in 1985.

[8] To the best of the Defendant's recollection, she identifies a town as Bunco, which may in fact be the city of Burco, Somalia.

Ethiopia in the war;[9] it eventually came to embrace an alliance with the United States, and became a full-scale military dictatorship during the Reagan years, ushering in its own decline into instability and civil war.   Amina's father left the security forces as the military repression escalated; he eventually moved back to his hometown and operated a small store with dry goods and hardware for sale.   Amina recalls she lived with her father and some of her siblings for about a year, then her mother came to Bunco and took her back to live in Mogadishu, where they were eventually joined by her other brothers and sisters.   Once Dhuha moved her kids back to Mogadishu, Amina lived only with her mother and her mother's new husband—a veterinarian—and saw her father again only on rare occasions, as he continued working in the north.

Amina is deaf in her right ear, as a result of an infection she got when tending the family's cattle at home at age five or six—an itch in her ear prompted her to use a corn stalk to scratch it, rupturing the ear-drum, which became infected.   Several days went by before she told anyone about the pain, and the infection grew too severe to save her hearing.

In the early 1980's, Mogadishu University underwent a building boom, expanding its campus and facilities to be among the finest universities in east Africa. Dhuha worked there as an inspector checking art materials. Amina recalls that her mother often worked full-time during the days at the school—notable enough, in a society where mothers did not

---

[9] Cuban troops and Russian materiel arrived to buttress Ethiopia in regaining the Ogaden zone; Somalia abandoned its socialist leanings in a wholesale geopolitical realignment with the U.S., and has never recovered its territory. Prior to the Soviet embrace of Ethiopia, the Said Barre regime was a Marxist leaning military dictatorship. Afterward he was embraced by the United States as part of the bastion of the anti-communist world. Same government, different perception. A cynical observer of U.S. foreign policy might sense political opportunism. The Somali's were not fooled. By the latter 1980's the northwest of Somalia was in full revolt against the Said Barre government.

typically work outside the home. Because of societal norms discouraging education of women in the area where Dhuha grew up, Amina's mother had no formal education whatsoever, but managed to provide for the family by always having a job. They lived comfortably enough in a small rented house on a plot of land-- "Venti per venti," or 20 meters square.[10] Dhuha's children generally enjoyed good health and care at home. In addition, Somalia instituted free public education for all children at the start of the republic, so each of Dhuha's children was able to attend primary school.

Amina recollects an important time for her when she was approximately seven years old. Her mother took her and some of her siblings to the nomadic regions, where she met her grandmother and other sub-clan relatives. As she recalls, the family got a ride out of the city in a truck, which left them at the end of the main paved highway going northeast. They walked for a day on dirt roads and foot paths, arriving at a small village of tents, set in a wide prairie, where her maternal sub-clan had camped for the spring pasturage. There, her relatives herded sheep and goats, and tended many camels, keeping traditional ways. She stayed there with her grandmother for about six months, sleeping in a tent at night with her mother, but living entirely outdoors during waking hours, cooking meals, doing chores, and tending animals. The family moved from place to place following good grazing and water. She would visit with the nomadic part of her family one other time, in 1986, accompanied by her niece, following the death of her grandmother.

---

[10] Somalis in the south still use Italian terms regarding land, schooling and citizenship, reflecting the long tenure of Italian administrative rule over the colony, and later as part of Italian East Africa; pasta is a staple of cooking and eating in the south; many older people still speak some Italian, along with Somali and clerical Arabic.

Mogadishu was a big city even in the 1980's, with several million residents, an older central core and historical center, and a bustling port. It enjoyed a remarkable diversity both from a child's viewpoint as well from demographic observation, situated at the crossroads of the Arab, African and European worlds, where the Red Sea debouches Mediterranean and Levantine trade into the Indian Ocean. At various times, Amina recalls, according to the year and to the cycles of drought and rain, the city would swell with country-people from the nomad regions coming to the markets, to buy and sell, or escaping tough times in the grasslands, fleeing drought or famine; at other times, she remembers refugees from the many wars in the region, camped out in her neighborhood. Nomad herders and refugees alike would live in the streets—Ugandans, Sudanese, Yemeni Arabs, west Africans—and Mogadishu had sprawling sectors of shanty-style, improvised housing that might appear as if overnight, only to be bulldozed away a year later. Periodic government crackdowns on the refugees would often turn violent.

## 2. The Somali civil war and refugee life.

Amina went to public school through age sixteen. Most of her education took place under the auspices of an Islamic school system, which taught Arabic and religion, in addition to grammar and math, history and practical subjects. She recalls that she loved school very much, and had high hopes of attending university one day. Amina was close to finishing the equivalent of high school when the city collapsed in fighting during the early months of the Somali civil war, in 1991. In the lead up to bloodshed, the university had closed down, so Dhuha was laid off and not working at the start of the war. Unrest

and civil dysfunction began in January of that year, after Siad Barre was ousted by a campaign of northern political parties and warlords set on creating a new "reform" government. Fighting erupted among and between the northern parties soon afterward—competing militias turned on each other after the dictator Barre fled the capital. As General Mohamed Farrah Aidid's army achieved superiority, the struggle took shape mostly along clan-based lines, with Hawiye from the north battling Darod predominantly from the south—resulting in widespread dislocation for Somalis, especially in the south. As Amina saw it, the Hawiye "were angry over the president (Barre)," and they began to attack the Darod clan wherever they might find them, driving them from towns and neighborhoods of the city.[11]

Mogadishu became an urban battle zone, while in the surrounding countryside harvest and herding were completely disrupted by fighting. Famine ensued and by 1992 the economy in the capital had collapsed. Food and work were no longer to be had, and violence supplanted the rule of law. Hawiye militia groups in the city deliberately targeted Darod neighborhoods for violence against residents, clearing areas house-by-house. Amina recalls local Darod families driven out in a panic, as people were

---

[11] In brief, the United Somali Congress—a predominantly Hawiye-clan party under the leadership of the warlord Aidid—along with a handful of other armed political groups, opposed President Siad Barre's continued claim of legitimacy. Their insurgent reform movement splintered into general fighting with Barre and each other over control of the city, with Barre's militia retreating to the south. The collapse of civil institutions and political control in 1991 led to a general famine and extreme inter-clan violence, with as many as 320,000 dead. A UN Security Council resolution in 1992 established the United Nations Operation in Somalia (UNOSOM), a peace-keeping initiative with a multinational armed force, including a task force to safe-guard humanitarian relief, led by the United States. By the summer of 1993, some of the warlord factions—notably, General Aidid—turned on the peacekeepers, including Pakistani troops and, famously, U.S. Army Rangers (*see* "Black Hawk Down," e.g.), with considerable casualties. The U.N. would eventually withdraw its mission from the country two years later, concentrating primarily on the Somali refugee situation in neighboring countries.

leaving on all sides.   Her Uncle Keyse and a cousin, Qasim, were attacked in the streets and killed; another uncle, Hassan—a student—was shot dead during violence at the university, leaving behind a pregnant wife, her whereabouts unknown.   As Amina recalls it, "Everyone suddenly had guns—the neighbors, everybody—some of them turned on us." Teenage girls and mothers were raped and killed in the worst inter-communal violence seen in east Africa—the use of rape as a terror weapon against civilians cast the violence in new, irreconcilable terms.   Amina's stepfather had been in the southern part of Somalia when war broke out—they never saw him again and later heard that he had died.   It was no longer safe for Dhuha and her children in Mogadishu, so the family packed up and left for the nomadic interior.   Amina would never again see Mogadishu; she was sixteen years old as she embarked on life as a refugee.

Traveling by car and hitching rides with other Somalis on the roads—some of whom were sympathetic Hawiye-clan families—they gradually made their way onto the plains of Ogaden.   They paid money to a Hawiye man with a pickup truck who drove them most of the way to Shilavo,[12] a small Somali village of some 4,000 people, well inside Ethiopia's official border.   The truck kept stopping to pick up more families along the way, until there were two dozen people in the back.   The entire retreat to Shilavo took about ten days.   At night, they hid among the trees and bushes, or slept on the ground, terrified.   Amina's brothers Hussein, a year older than she, and Jamal, were the men of the family now, but they were still boys, teenagers, and unarmed.   She and her mother were

---

[12] Alternately spelled "Shilabo" in maps and news reports.

terrified that, if they were stopped by any Somali militia, the boys might be killed or impressed into the ranks as fighters.   Though not as dangerous as the roving militias, the refugees likewise had to avoid the Ethiopian army, which had supported the northern Somali militias, lest they be interned or killed.   Ethiopian troops also had a reputation for using rape as a weapon against defenseless civilians.   For its part, Ethiopian troops were on the lookout for an influx of southern Darod clan Somalis into the Ogaden, with extreme prejudice against letting the southerners in.   Animosity between the Ethiopians and the Barre regime was long simmering, and it was well-known among Somalis in Mogadishu that northern warlords were being financed and trained, at least in part, by Ethiopia.[13] Amina protected the boys and made them cover their faces by day, hidden in the depths of the truck.   Dhuha and six of her children,[14] as well as cousins from the city, all reached Shilavo safely and stayed alongside a Somali family from a different clan there, distantly related to her grandmother's people.   There, Dhuha secured a tent while some of her kids slept outside on the ground at night.   Upon arrival in Shilavo, authorities assigned the family a plot.   Sub-clan relatives of Amina's stepfather helped the family over the first weeks as they built a structure to protect them from the rain and sun.   By collecting sticks

---

[13] This suspicion would be borne out a few years later when Ethiopian troops invaded northern Somalia to intervene on the side of its client militia, seizing the regional capital of Garba Harre in 1999, thus beginning its long occupation. To many Somalis from the southern part of the country, landlocked, mostly Christian Ethiopia has been viewed as an unfriendly neighbor bent on destroying Somalia and taking control of its long coastline. The memory of how the Ogaden region was wrenched away by European powers and "awarded" to Ethiopia remains fresh in the collective political memory. As such, the African Union multi-national army, which featured a majority Ethiopian component, alongside Ugandans, Burundis and Kenyans, was viewed as an occupying force coming to divide and conquer Somalia, keeping it in a weakened and exploitable state. Likewise, the international effort to support the Transitional Federal Government since 2004 has come to be seen as a European plot to nullify Somali self-determination.
[14] The eldest son of the family, Adam, had left Somalia before the civil war, working in various Arab countries, eventually arriving in Atlanta, Georgia.

and scraps of wood, they were able to build a makeshift shelter, although when finished it fared better at keeping out animals than stopping the elements. Neighbors gave them food. Their encampment had no water or electricity, consisting of tarps or sleeping pallets arranged around a small shack on a plot of land. More refugees from the fighting arrived almost daily, as Shilavo and the nearby villages became *de facto* refugee camps for displaced Somalis.

Amina lived in Shilavo for approximately the next twelve months—a grueling year in her life, as she tried to care for her mother and younger siblings, and keep her family intact, while living out of doors, entirely dependent on the charity of others. As the refugee problem became increasingly protracted—within ten years, approximately 700,000 Somalis would be officially designated as under the care of the United Nations High Commission on Refugees, with perhaps another quarter million unaccounted for but living in improvised, temporary conditions—Amina looked for a way out, and a way to earn some money to help her mother. Her older brother Hussein had left within a few weeks for the Arab peninsula, in hope of finding work.

While she recalls that the Somali people in Shilavo "were very good to us," the area remained generally busy with hostile Ethiopians—both regular army soldiers and militia units. Frequent raids on the refugee village at Shilavo occurred—often under the guise of "looking" for weapons—but it remained a relatively safe place to live. While Amina and her mother knew of several families in Mogadishu whose daughters were assaulted or kidnapped by daylight, in Shilavo such events were rare. Reports filtered in of teenage

22

boys who had gone missing in other camps, with rumors that they had been impressed into irregular militias by the Ethiopians, and sent back into the fighting.   A Mogadishu family living in Shilavo reported its daughter as kidnapped, only to have her returned days later, beaten by Ethiopian soldiers.   Amina was not permitted to leave her mother's sight, and spent her days covered and in hiding. Dhuha lived in constant fear of the sound of pickup trucks coming from a distance.   At night, anyone leaving the safety of the camp area did so at their peril, especially women.   The UN began to track in the 1990's the widespread phenomenon of sexual assault by soldiers on Somali refugees, noting in a Unicef report[15]

> The incidence of rape was reported to be alarmingly high at camps for Somali refugees in Kenya in 1993. The camps were located in isolated areas, and hundreds of women were raped in night raids or while foraging for firewood.

Amina heard the worst of these stories.   As a seventeen year old girl, she knew all too well that she was vulnerable; that her presence even endangered her brothers and her mother, lest it attract violence.   She could not stay in Shilavo, and determined to break out, recalling that "there was nothing there for us, no way to get anywhere."   Amina wanted to make a difference for her family and herself.

Women at the Shilavo camp took up a collection for her, and gave her some money to travel.   Together with two other young women from Shilavo, Amina set out on a long, dangerous overland trip of more than 750 miles, through the heart of Ethiopia, to Djibouti and eventually to the port city of Assab, in Eritrea.   Together with her travel companions,

---

[15] *The State of the World's Children, 1996,* "Sexual Violence as a Weapon of War;" United Nations Children's Fund, 1996.

Amina put her faith in God to deliver them unharmed, through so many difficult miles.   At times, they were fortunate in hitching rides on trucks with sympathetic drivers; at other times, the three girls walked as much as thirty miles in a day, tramping along the roadside in full *hijab*, their heads and faces covered, through village after village, ducking if they heard the sound of army trucks.   If a town was large enough to have a *masjid,* or mosque, they might get a meal for free from the religious authorities.   Most days they paid money for food.   At night, they slept in hiding, on the ground under trees away from the road.   In some regions close to the border of the northern part of Somalia, they traveled only at night, to avoid the towns and the Ethiopian army, which was very active in the border areas.   Everywhere they walked, people were on the roads—entire families with their belongings, or mothers with children and little else beyond the clothes on their back—all looking for refuge.

It took two weeks to get to Eritrea.   At the port in Assab, Amina and the girls met more Somalis seeking passage to Yemen—a man and his wife from the south, and a few others, numbering about ten in all.   Together, they pooled their money to hire boat passage from a Somali man who owned a small fishing boat, and who had established a lucrative trade transporting refugees.   Amina chipped in the equivalent of $30 USD for a spot in the boat.   With her companions and the other refugees, she left Africa behind to set out for Arabia, on an all-day slow motor across the *Bab al-Mandab*, the legendary "Gate of Sorrow," the oceanic strait that connects the Red Sea to the Gulf of Aden, and separates the continents.   The cheap boat passage was very dangerous.   The Somalis—Darod, Hawiye

and Issak alike—were soaking wet the entire journey, and convinced they would all drown. They vowed to stay together for protection in Yemen, and feared the Arabs more than a little.   Yet Amina took courage from the fact that she would finally walk in the lands of the Prophet, and she was sure her fortune would improve.

Safely landed on the Yemen coast, the refugees made for the capital, San'aa, where a Somali enclave might have news of her brother, Hussein.   The outskirts of the city and the outlying marketplaces had many Somali refugees, and she asked everywhere for relatives, seeking a family connection, or information on Hussein's whereabouts, who unbeknownst to her, had moved on to Saudi Arabia.   Together with several other young women, she rented a spot in the capital in a kind of dormitory for unmarried women run by Somalis, and there they slept six or eight to a room.   Many of the girls took jobs as domestic servants for Arab families, and Amina's roommates would periodically move out to big houses in the wealthier suburbs.   Amina had trained as a nurse's helper at age fifteen—before the civil war—at an after school program in Mogadishu sponsored by the International Red Cross/Red Crescent Society, where she learned basic nursing functions, such as dressing a wound or giving an injection.   This training had led to a volunteer job at Medina Hospital in Mogadishu, where she worked after school in the year leading up to the war, earning occasional tips from grateful doctors.   With this experience, she took a nursing job at a village medical clinic a ten hour drive by car from San'aa. She would go down for a week, and sleep at the clinic, returning to her rented room in San'aa every five or six days, to await their call.   Amina earned only a pittance, and being so far from the

capital made it difficult for her to get into any educational programs or training. She wanted desperately to enroll in a vocational course to learn the job of a medical lab technician, but she couldn't afford the tuition to the Yemeni school, and they did not offer scholarships to Africans. Jobs were sporadic and short term, and often didn't result in wages actually being paid. After a year, Amina had come to dislike Yemen—while some Arabs were decent enough to her, in general, she and the other Somalis felt the scorn of most Yemenis on a daily basis, who regarded them as little more than an easily-exploited labor pool, so eager for work you could pay them in rice or bread.

For over a year, by searching out clues daily, Amina had learned through other Darod Somalis that her brother Adam—who had made it to America after his own long journey—had a phone number in Atlanta, Georgia. She saved up enough money to make the call. Adam told her he was doing well in America, working, studying and saving money, and he instructed her on the phone to go back to Shilavo immediately and collect the family; that he had independently located the rest of her family in Ethiopia. Adam said he would make contact again soon with some kind of new arrangement, and would get money to them all via the informal network of the *hawala* credit transfers used by Somalis the world over. Relieved to have any news at all of his mother and siblings, Adam stressed that Amina must return to Africa and protect the family. She obeyed her brother and set out again in reverse, back to Ethiopia.

Amina made her way back from Makha in Yemen, in another leaky fishing boat—this time, the engine quit, stranding the passengers in the Gulf of Aden at sunset with

no power, terrified as the vessel took on water.   The crew put up a sail, and bailed out the boat, as the very real danger of swamping became critical.   The trip across the water took the entire night—rather than the four or five hours—and Amina arrived back in Abab at daybreak.   She travelled over land in a truck with two others headed to Ethiopia, until they were stopped by Afar clansmen, who took them for their hated rivals, the Isse, because of their tribal dress.   Amina's basic abilities in English saved the day, as one of the Afar clansmen spoke some English.   She was able to explain that they came from Mogadishu. Thereafter they stayed away from Afar villages.

Reuniting with her family in late 1994, Amina told her mother the good news. They contacted Adam again from a phone in the village—he sent small amounts of money to a *hawala*[16] in the Ethiopian capital, Addis Ababa. Dhuha used the funds to rent a one room, cold water apartment, lit by oil lamps and hearth-fire.   Somalis were unable to legally work in Addis Ababa—the local government forbade them to seek any work, under penalty of arrest, and required refugees to register for permission to be in the city. Nonetheless, rich families hired Somalis as domestic servants.   Dhuha tried to get jobs cleaning homes, while fearing the constant threat of arrest.   The family would live the next two years entirely off Adam's remittances from Georgia, via the Somali credit network

---

[16] The *hawala* system works essentially as both a value-transfer network and a micro-credit lending system.   The use of *hawala* is ubiquitous among Somalis and other Africans, and represents a parallel system to the normal means of finance transaction in international banking.   It is used almost always in the service of foreign remittance—that is, getting funds to family members across national boundaries, to pay for food, clothing, schooling, medical care or to start a business, or pay a debt.   *Hawala* moves money without actually sending any funds, and without any promissory instrument or documentation, typically from the wealthy northern and western hemispheres to the poorest patch on the globe.   At least some part of *hawala* takes the form of services or goods bartered, including food.   It is a system built on honor, and implicitly, Islamic law and practice.   *Hawala* brokers keep a small commission, but the system functions based on trust across vast distances.

from Atlanta, plus whatever Dhuha could earn.   All the while, Adam worked from his end to secure a sponsorship for the family to get visas to the United States as refugees, while saving money for their passage.   In Addis Ababa, the family underwent a refugee screening process for permission to go to the United States, while living eleven to a room. In September of 1995, the family suffered a setback in its plans when their screening for entry to the US was derailed by a false positive on an AIDS test by Amina's mother.   After further testing, Dhuha came up negative for the disease, and they were on the wait list again.

Working three jobs, while studying English and supporting his family in Ethiopia, Adam laid aside and borrowed enough money in eighteen months to pay for air fare for Dhuha, Amina, Abdiwali, and three of Farah Ali's children (Amina's step-sisters, all under ten years old).   The adult fare was $1,100.00 per ticket, with some of the fare advanced by the International Organization for Migration (IOM)—a refugee relief NGO active over the years in war-torn areas all over Africa, as well as in the Middle East.   IOM also helped arrange for Somalis to apply for refugee placement in Europe, North America and elsewhere.   Once in the United States, Amina and Dhuha would have to pay IOM back for most of the air travel costs advanced to them.   Amina arrived in Atlanta on January 24, 1996—Adam had prepared a small two-bedroom apartment for the family in Decatur, Georgia. Amina was now a twenty-year old war refugee, and she had made it to the United States.

### 3. The Defendant's arrival in the United States.

In her first year in America, Amina wanted to attend school, to attend ESL classes and learn English, hoping to convert her lost years in the maelstrom of civil war into a new life, in a new country. At Clark Atlanta University in Georgia, she attended English classes for a year, completing four separate units towards completion of an ESL course, intended as a college preparatory path, to get her up to speed for enrolling in a bachelor's program. This plan became sidetracked dramatically in 1997, when Amina's mother, Dhuha—who had been doing childcare at the apartment for the younger kids while Amina went to class and worked jobs—suddenly fell ill and became hospitalized. As Amina tells it, one day her lungs simply failed, and she became unable to get her breath. In pain, Dhuha visited the emergency room at an Atlanta hospital, where she stayed two days, before the family moved her to a private doctor's care. Over the next few months, she lost muscle mass and weight at an alarming rate, and appeared to be wasting away. By summer she was unable to walk—not paralyzed, but rather deteriorating in muscle and ambulatory ability from the waist down. Doctors were at a loss to explain the problem, and the family focused on how to get her treatment, and how to pay for it.

Amina took over management of the household entirely, now caring for her sick mother, while organizing the daily requirements for her youngest sibling, ten year old Abdiwali, and the three kids from her father's second marriage, ages eight, nine and ten.[17]

---

[17] It was not considered unusual in the context of the Somali refugee community living abroad to find step-children from different marriages consolidated in one household, or even children from the same village or neighborhood being raised in one family setting. Amina's brother Adam had arranged it so that his father and mother's various children might have a chance equally in America.

Amina took care of the cooking and cleaning for the four young children—Abdiwali, Ash, Hamdi and Fuad--and saw to getting them enrolled in school, and attending their classes. Adam helped considerably with expenses, diverting his former overseas remittances to the household in Atlanta.  Simultaneously, Amina worked at retail jobs in shopping malls near their home.  From April 1996 through May of 1999, she was at various times a minimum wage employee of Sears, where she worked in the warehouse loading trucks; Marshalls, where she had temp loading and packing jobs that were more or less full-time; and TJ Maxx (the successor company which merged with Marshalls), where she likewise worked in warehouse operations.  She ultimately went to work in 1999 for a retail servicing company called Rapid Pack, which packed and shipped orders to the specifications of vendors.

Her mother's condition did not improve during almost two years of therapy in Atlanta.  Testing for cancer had yielded varied results.  Ultimately, doctors decided she was diabetic, but by then she had lost so much weight she could no longer walk. Painkillers and insulin improved her a little, but her condition was dire.[18]  While talking with Somalis in the Atlanta community who had relatives in the Minneapolis area—the largest Somali refugee community in the United States[19]—Amina learned of the famous Mayo Clinic, and its reputation as one of the world's leading diagnosis and treatment centers for difficult, tertiary care cases.  For Amina—who credited her mother's fortitude in preserving her family, and safeguarding them from the purgatory of east Africa to give

---

[18]  Dhuha would not qualify for Medicaid/SSI eligibility until later in 1998.
[19]  By 2011 estimates, approximately 32,000 Somalis live in the greater Minneapolis/Hennepin County area. Williams, Chris, "New census data: Minnesota Somali population grows," *Star Tribune*, 27 Oct. 2011.

them a chance in America—the only choice was clear: although they came from one of the poorest countries on earth, now they were in the greatest nation, and she would make sure her mother had access to the very best.   In May, the family packed up and moved to Minnesota, with Adam driving the truck full of their household goods from Georgia. They lived the first two months in Minneapolis with Somali friends from Atlanta, before finding a three bedroom apartment in Stewartville, MN, eleven miles from Rochester, home of the Mayo Clinic, where a thriving Somali community already existed.   Public assistance helped pay the rent.   Amina got her mother into Mayo that spring for screening tests.   The family moved into their new home in July, 1999.   Amina immediately went to work that same month, securing a spot at the temp agency, Manpower, as a warehouse laborer.   She became an intermittent worker at IBM's shipping facility, with mostly steady work alternating with brief periods of layoff.   When in need, the family borrowed money within the Somali community.

Amina moved back to Rochester in September of 2000, and married in October. Around this time she began working as a nurse's home health aide[20] for minimum wage. When her mother—who had regained the use of her legs with a walker—fell at home in 2002, shattering her hip in three places, Amina again found her life closely circumscribed by the duties of an eldest daughter.   Following her mother's accident, Amina would rarely attend any academic classes, but would instead find her life organized entirely around

---

[20]  Amina worked at Semcil United Home Health Care during the first years of her marriage, until a few weeks before the birth of child F., in 2003.   Her duties mostly tended to helping bed-ridden elderly people in the Twin Cities area, including bathing and toileting her charges, and fixing their meals.

care-giving and home-making[21] for her children, her husband and her elderly mother, plus taking care of charges as a home health worker.[22]

Amina met her husband Faisal Farah Mohamed in Rochester in 1999—he was also a Darod clan member from the south, and Amina had known Faisal's aunt in Ethiopia. In fact, her first contact with Faisal was on behalf of this relative, when she placed a telephone call from Atlanta to her husband-to-be in Virginia to convey news from his aunt in Africa; they did not meet face to face until both had relocated to Minnesota. Faisal had earned an undergraduate degree in physics and mathematics in Somalia in 1991, and had just begun his graduate studies, teaching at the University of Mogadishu, when the civil war put an end to all thoughts of a career in science in his home country. He spent 1991-1993 in Tika, a massive UN refugee camp near Nairobi, Kenya. A brother in England helped him

---

[21] The Defendant's daily schedule was formidable and rife with all the trials and tribulations of parenting in America. For example, Amina also trained her younger siblings and half-siblings to care for Dhuha and provide medication for those times when she could not be there. At night she checked in on Dhuha, or called to make sure the teenagers were minding their mother, but often the kids wouldn't listen, and refused to help. Her brother Adam took three of the kids for a short time to live with him while Hamdi stayed with Dhuha—but he couldn't handle them either. Adam sent Abdiwali to Atlanta when he was eighteen, and in eleventh grade; he wanted to send Asha back, but Amina advised against it. Asha had problems on her return to live with Amina in Minnesota, and was expelled from school. Fuad, too, was sent back to live with Amina after he had got in trouble in Georgia for stealing cars; Fuad would ultimately drop out after 9th grade. Amina typically went to Dhuha's house every afternoon to take care of her mother; Fuad and Asha were living there, but not getting along with their mom. For example, they hid her medications. Amina confronted them, and ultimately resorted to calling the police. The teens maintained their denial and the matter went unresolved, ultimately leading to Asha moving out two months from her eighteenth birthday. Fuad went to live with Hussein, while Hamdi was sent to Jamal in Atlanta. Amina stayed with her mom until they could find a place for all of them together—her family and her mother—as she was pregnant with her first child. In January of 2002 they established their home in Rochester.

Hussein brought Fuad back to Amina after less than two years, September 2001 – May 2003, unable to discipline the boy. Fuad, back in Minnesota, began skipping school again, forging notes from his mother. Amina finally went to the county to see if it could help. Child protection put Fuad in an alternative school where he did very well and got his GED, and eventually began vocational training. When he turned eighteen, he attained his majority, but soon afterward started drinking alcohol. He has only had sporadic contact with Amina and his mom since that time, and lives in Minneapolis. Asha has had two marriages and a number of children, and lives in Minnesota.

[22] A considerable share of the home health workers in the Twin Cities area are Somali or Nigerian, working entry-level jobs doing elder care for the aging local population.

get together enough money to survive, and to seize an opportunity at resettlement[23] in the U.S., going first to Virginia, and ultimately to Minneapolis in December of 1997, to take a job at IBM.  Amina, who knew of Faisal from IBM, asked him for advice one day in sending money to relatives by way of the informal *hawala* system,[24] and their friendship grew from there.  When IBM downsized his job—sending an entire division based in Rochester to the Philippines—Faisal went back to school to earn a two-year degree as a laboratory technician.  He and Amina married in October of 2000 while he was still studying and working nights, and they all lived together in a Rochester three-bedroom apartment with Dhuha and the children, where rent was about $1,200 per month.   After finishing his degree, Faisal applied to the Mayo Clinic for a technician opening, and started there in July of 2002.

### 4.  The Defendant's mental, physical and family health.

Somali culture—still essentially nomadic and pastoral in mentality, if not in practice—places a very high value on children and large families. Amina and Faisal were no different, residing in America, than Somalis living back home, or in UN refugee camps

---

[23]  Sponsored by a Christian relief agency, United World Church, Faisal gained legal refugee status in the U.S. in 1996.

[24]  By some estimates, the Minnesota Somali community sends over US $5 million in remittances to relatives overseas by means of the *hawala* informal banking and micro-credit system.   While   much of the money remitted goes for direct family support, a significant amount becomes the basis of overseas investment in family ventures—for example, Faisal has sent small amounts of money via *hawala* to help pay for a trucking business, construction of apartments for rent, and higher education costs for relatives, all intended to support families there.   In his more than sixteen years in the United States, Amina's husband estimates that he has sent over US $25,000 to various family members in various locations, and indeed, he cannot think of a single working Somali man or woman in Minnesota who does not engage in the practice.   A 2005 estimate of remittances to Somalia put the figure at US $1 billion [*see* UN Office for the Coordination of Humanitarian Affairs, *IRIN* news service, "Somalia: Remittances—a Lifeline to Survival," 18 May 2005]; this figure represents almost half of the country's 2005 GDP of $2.3 billion.   In urban Somali households, remittance from abroad constitutes 40% of family finance.   Academic discussion remarks upon the singular fact that throughout much of the past decade, Somalia has been a failed state with a functioning, if not thriving, economy based on foreign remittance.   *See* generally, Maimbo, Samuel Munzele, ed., "Remittances and Economic Development in Somalia: an Overview," *Social Development Papers—Conflict Prevention and Reconstruction,* no. 38; The World Bank, November 2006.

where birth rates remain very high.  Yet from the start, the shadow of cultural practice hung over the marriage and its hopes for reproductive success.   As is the case with perhaps 90% of Somali women today (a rate even higher in the early 1980's), Amina Ali underwent a genital infibulation procedure in the clan village she visited as a girl. [25] Infibulation—referred to by the World Health Organization[26] as Type III Female Genital Mutilation (FGM)—is the third, most severe level of the procedure, comprising clitorodectomy, excision of the *labia minora* and *labia majora*, and the infibulation, or the stitching together of the de-braded external vaginal tissue to form a constricted opening after healing.[27]   This controversial practice—condemned by governments and religious authorities alike[28]—is typically performed by women in the clan on girls before the onset of puberty.  The age for the procedure has been falling for years, and in Somalia, it is common for mothers to take their seven and eight-year olds to see elder women in their clans, who wield the knife and carry out the primitive surgery.   Acrimony exists between those who defend the practice and its worldwide legions of detractors—in the West and in Africa, too—leading to controversy over the purpose of female genital cutting, or what its most vocal critics call mutilation.   Critics and campaigners against FGM generally

---

[25] Some studies put this figure at 98% in Somalia, while somewhat lower in Djibouti, Eritrea and Kenya—for a comprehensive but brief overview, see the heavily-sourced study at *PATH:   A Catalyst for Global Health;* Reymond, Mohamud, and Ali, "Female Genital Mutilation—the Facts," the Wallace Foundation, 1997.

[26] WHO estimates that over 160 million women worldwide have undergone female genital cutting.

[27] Nawal M. Nahour, MD, National Institutes of Health, *Reviews in Obstetrics and Gynecology,* "Female Genital Cutting: A Persisting Practice," 2008 Summer, 1 (3) 135-139.   "Generally, midwives or trained circumcisers go from village to village and perform the cutting with no anesthesia, antibiotics, or sterile technique.   Their instruments are knives, razors, scissors, or hot objects that are reused.   After the tissue has been excised, sutures, thread, and local concoctions such as oil, honey, dough, or tree sap are used to ease bleeding."

[28] Contrary to widespread belief among Africans, there is no basis in religious scriptural doctrine for the practice, which is generally not found among Arabs; both Muslims from east Africa and Christians from east Africa have been known to claim a religious basis for female genital cutting, alongside tribal and cultural justifications.

explicate the practice as a form of child abuse meant to enforce patriarchy[29] while repressing female gender, sexual, and economic freedom, subjugating the female body in its most intimate aspect to male control from the outset, without consent. The dwindling number of those willing to go on the record publicly in support of the clitorodectomy or its related procedures generally cite to reasons of cultural tradition, maintaining a blood ritual from time immemorial, and enforcing female chastity and sexual continence,[30] while comparing it with the accepted Western medical convention of male circumcision. Female genital cutting has been illegal in the United States since 1996, and outlawed in much of the developed world for over twenty years.

It is believed that Amina underwent this procedure in Mogadishu, when she was approximately eight years old. She cannot articulate the experience today, and has indeed suppressed all but its vaguest memory, and shows enduring signs of severe emotional pain from this deeply guarded and complex fact. Nonetheless, the consequences many years later and a continent away, for a twenty-five year old woman wanting to become a wife and mother, were physically devastating. In the typical infibulation,

> [a]fter excision of the clitoris and the labia minora, the labia majora are cut or
> scraped away to create raw surfaces, which are held in contact until they

---

[29] Typically, in those societies where the practice flourishes, adult females who have not undergone genital excision of some type are automatically disqualified by the clan, tribe or family as candidates for marriage, and are rejected as "unclean," "unsuitable, "or "disobedient," and are denied marriage rights by males, or even driven from adult society.

[30] Nahour, *op cit.,* "Parents who continue this practice are compassionate and loving. They believe that they are protecting their daughters from harm. Reasons that parents and practitioners give for the procedure include rite of passage, preserving chastity, ensuring marriageability, improving fertility, religious requirement, hygiene, and enhancing sexual pleasure for men. Parents who insist that their daughters undergo FGC are driven by a fear that their daughters may never marry. An unmarried daughter is ostracized and shunned in these societies, and may be seen as unclean, unhygienic, and perhaps even labeled as a prostitute. Some societies believe that the clitoris is toxic, and if during child birth the clitoris touches the baby's head, the baby will die. Some societies believe that if unchecked, the clitoris will grow until it touches the ground. Thus, removing the clitoris improves survival, ensures beauty, and preserves their daughter's reputation."

heal, either by stitching the edges of the wound or by tying the legs together. As the wounds heal, scar tissue joins the labia and covers the urethra and most of the vaginal orifice, leaving an opening that may be as small as a matchstick for the passage of urine and menstrual blood.[31]

Unsurprisingly, many women undergoing this procedure encounter severe reproductive complications as adults. Unable to consummate her marriage, Amina had a series of surgical procedures at the Mayo Clinic starting in late 2000, to reverse the physical damage wrought by her life as a girl in Somalia. She suffered three miscarriages before finally becoming pregnant in 2001; their first daughter, child A., was born in Rochester later that year. Amina suffered at least three more miscarriages, she believes, before the birth of their second daughter, child F., in June of 2003. Numerous studies of infibulation have documented a strong connection between the procedure and the difficulty of carrying a child to term, as the scarification and adult changes to the genitalia complicate the risk variables for a healthy pregnancy.

Her life in Somalia has left her health compromised in other ways, as well. Amina has struggled with tuberculosis throughout her life, most likely contracted during her childhood when she went to a clinic in Mogadishu at age eleven suffering from a fever, and stayed two days in an emergency setting with many sick people; she was subsequently diagnosed by UN health-workers a year later as positive for tuberculosis. Amina indicates that she received both traditional African healing for her TB, as well as UN-dispensed medications during her pubescent years. Fortunately, she has been mostly asymptomatic

---

[31] Althaus, Frances, *International Family Planning Perspectives,* Vol. 23, No. 3, 1997, "Female Circumcision: Rite of Passage or Violation of Rights?"

through her life; various tests over the years in Atlanta, at the Olmstead Clinic, at Mayo and recently in her capacity of testing as a home health care aide have returned negative results for TB reoccurrence.    Recent x-ray testing at the Mayo Clinic confirmed an occluded area on her lungs and the onset of asthma, which requires continued monitoring and treatment.

As a new mother and housewife, Amina relished her place in her community, and her new country.    Her mother's health worsened after the birth of child F., and Dhuah became entirely bedridden.    Amina quickly organized help among the other mothers and wives in her circle in Rochester, so that Dhuha always had a care-giver present even when Amina could not be there, or needed a break with two small toddlers in the house.    She eventually contacted a visiting nurse service, Shiffo Home Health Care, partly subsidized by the county, and organized care for her mother, combining family resources, the service's own home health aides, and herself.    The service was sufficiently impressed by Amina—who had a background in practical nursing—that it hired her for care-giver duties in 2006, and she continued in this job until the time of her arrest.

In Somali life, clan and tribal relationships typically form the web of social obligations, which in their homeland has been directed chiefly towards survival—whether in the difficult pastoral nomadic conditions of traditional life, or in the urban setting. More recently, clan and tribe have, to an extent, both formed a basis for the civil war and the ongoing opposition by groups, such as Al Shabaab,[32] resisting the Transitional Federal

---

[32] Al Shabaab itself is the military successor to the Islamic Courts Union, a coalition of southern and central Somali political Islamists who took power in and around Mogadishu in 2006, in opposition to what was viewed as a government imposed by northerners and their foreign supporters, including African armies from neighboring states. The Somali Transitional Federal Government, in fact, was organized in 2004 in Kenya, inaugurating a parliament and

Government and the foreign troops which backed it.   In the U.S.-based exile community of Somali refugees, community activism mostly expresses itself in the form of helping other refugees adjust to Minnesota, or Maine, or wherever enclaves have developed.

Amina threw herself into helping her community as a sister and a leader.   Indeed, in the more than forty letters of support attached to this submission, a familiar theme unites all those writing to the Court.   Amina Abdi, from Edina, MN, recounts how the Defendant helped her when she arrived in the community, when they had only just met, writing, "…Ali helped me to buy clothes and food, helped me to learn the city better . . . and helped to shop for and donate to those less fortunate than her, even though she didn't have much herself." (Exhibit 1).   Ms. Abdi says she will never forget "Amina Ali's willingness to help others . . . and never asking anything in return."   Similarly, Shukri Ali (no relation), a medical interpreter from Rochester, MN writes, "[Amina] went out of her way to give whatever she had to any unfortunate person she came across . . . even the homeless," noting that Amina justified her service to others by saying, "How can I expect anyone to help me when I am truly in need if I don't help others while they are in need?" (Exhibit 2).   Dahabo Mohammed, a caretaker and nanny living in Apple Valley, recollects how Amina founded a drop-in "circle" for local Somali women, a place to share issues such as child-rearing,

---

executive branch there, in exile—the 14th attempt since 1991 to form a government.  To many Somalis from the south, the TFG had all the appearance of a proxy government for the hated Ethiopians and their allies.   Support for Al Shabaab among refugees in camps in Ethiopia and Kenya varied, with southerners expressing mostly sympathy, even while fleeing the fighting.   By March of 2007, African Union peacekeepers from Uganda, Ghana, Kenya and Nigeria landed in Mogadishu amid the fighting between, on the one hand, the TFG and its Ethiopian Army forces, and on the other, Al Shabaab militias and other southern groups.   The African Union mission—including troops from seven countries—remains in place today, in support of the TFG, while today Al Shabaab has dwindled in its effective control of parts of the south, fighting Kenyan Army units along that country's border, while boxed in and split by TFG forces with the AU, its military control declining steadily since 2010.

prayer, and domestic abuse in their lives, noting that "Her warm personality and role in helping the most vulnerable in our community, especially the elderly and children, earned her the trust of the community." (Exhibit 3).  Foziya Bile, a pharmacy technician from Bloomington, remembers "Whenever a new person or family would settle in Minnesota from East Africa, Amina would ask us all to contribute furniture, clothes, food, and any way we can to help the new arrivals adjust." (Exhibit 4).   Noting her help to poor refugees, Mr. Mahad Adan writes of "her contributions to our city and community." (Exhibit 5). Filsan Mumin recalls how Amina "stood for the refugees and the destitute;" (Exhibit 6); Rochester Community and Tech College senior Hodan Abdulle calls Amina "a parent" to him, who "engaged our entire community into becoming one and united," (Exhibit 7), while his classmate Halima Ahmed calls her "a role model." (Exhibit 8).  Indeed, these letters from the community and many more[33] show in their depth and breadth of how the Defendant has touched so many lives.   Ikram Abdulle notes in his letter that "Amina is a good citizen and represents all the qualities we all seek in American citizens." (Exhibit 12).

Amina was a force for good in her community.   Through her willingness to reach out to those in need in her community and newcomers to the community, she built up a network of support. It is no accident that it was Amina who conceived and organized the clothing drives for Somalia. It was also no accident that her community responded to Amina's call to assist those in need.

---

[33]   From Guled Muhumed ["she was a woman of strength, being a good wife, taking care of her bedridden mother…being the best mother"] (Exhibit 9); Fatima Alikar ["It is very hard for me to see this happening to the sweet and gentle Aminah I knew and know, who sacrificed her time and wealth to help and serve others"] (Exhibit 10); and Hawo Abdullahi ["She was looking after her sick mom and helping poor people here in America and back in home."] (Exhibit 11).

For Amina, helping her fellow Somalis in Minnesota was not enough. In 2006-2007, during fierce fighting between factions in the worsening crisis back home, she listened to a BBC World News Hour report on continuing atrocities committed by Ethiopian troops against Somali refugees, amid the horrors of famine and drought, as thousands of Somali refugees were dying. In its reporting on the state of refugees from the south, the news story struck within Amina a deep chord of outrage and compassion, which spurred her in equal measure to act. The genesis of her criminal conduct in the case at bar began, she now recalls, with her response to this news report, broadcast over Minnesota Public Radio, which she listened to in a snowstorm while making breakfast for her kids. What began by one former refugee as an attempt to do something—anything!—to make a difference in the lives of current refugees, her countrymen, back in Somalia would ultimately lead to the acts for which she now stands convicted after trial.

### 5.  Amina's offense conduct.

Amina Ali recollects today the urgency she felt at that moment to respond to the humanitarian crisis in southern Somalia, saying "Allah showed me the way." For Amina, there would be no other acceptable discharge of her religious duties than to get involved directly, in howsoever small a way: "I didn't know anything, I had no experience how to do this." But she started by forming a network among her friends and neighbors—even though many discouraged her—and did her research. She quickly settled on clothing as the way to help, noting that "Americans have too much of it, and throw away clothing all

40

the time."   In Somalia, even the most humble t-shirt could be a desirable item; shoes and boots were highly sought after—farmers wear boots, and you could trade them for food. As for good clothing—like suits or jackets—the simplest items of cast-off American comfort could help people maintain dignity in the midst of calamity, or provide something to sell for money.   "I thought this would be easy, I had no idea."

She called Somali friends working in Dubai as maids or hotel cleaners, and asked them to recommend someone at the port.   A call-back from Bashir, a Somali working at the container port there, sent Amina the name of one businessman, whom she pestered, naively, for a quote on costs to get a container from Minneapolis to Dubai.   Ultimately, she got a quote for trucking a forty-foot container from Rochester to Baltimore, at $2,000; a shipper at the port in Maryland quoted $5,600 to ship it to Dubai.   The sympathetic but dubious Somali there offered to get it from Dubai to Mogadishu for free if she could pull this off.   "I talked to anyone who could help me," she says. A Hawiye Somali in Texas told her to get a baling machine to compress the clothing in bales, the better to fit in the rectangular container.   A Somali in Rochester helped her rent a garage for sorting the clothing donations, and she installed her baling machine there.   She parked the shipping container in the drive next to the house.

Amina's clothing drive would succeed mostly on the force of her personality, but would remain throughout, the vigorous expression of the hitherto untapped power of Somali housewives throughout Minnesota and the Midwest.   "Everyone brings me a garbage bag of clean clothes, and a little money—twenty or forty dollars, whatever they

had—to pay for the shipping costs." The operation scaled up quickly, becoming a considerable undertaking for one woman, as the first container filled up, and collecting money from the community to pay for transport.

Realities quickly intervened once the collected clothing left the United States. At the port in Dubai, the $5,600 fee to ship it to Dubai was no longer enough to unload it, and brokers demanded an additional $2,000. Amina reports, "They took our money, and then tried to steal from us. We had to pay them more." Next, the shipment from Dubai to Mogadishu—promised as "free"—was now a question of $3,000. Once in Mogadishu, the Somali port authorities demanded $1,100 in import "taxes." A trucking company to take the container overland demanded $500 up front for the pick-up, and an additional $100 per day plus expenses as it drove between refugee centers in the south. In addition, there were labor costs for unloading and sorting the clothing. Reading between the lines of Matthew Bryden's testimony, it is clear that the economy of Somalia—especially Mogadishu—depends upon exploiting the contributions of do-gooders from abroad.

Many calls to Dubai, begging for help from the Somali community, ensued, with Amina working every angle to get the shipping released and delivered to those in need. Ultimately, Amina would raise the $17,000 in costs to cover the container of clothes on its global perambulation. A businessman in Dubai offered her far more for the container's contents, but she persisted in getting the clothes to refugees, to give them away for free. "I didn't think it would be this expensive," Amina now reflects.

For the second container, she kept total costs under $11,000, having learned from her first experience, and having streamlined her network.  For the clothing drive there were at least twenty-nine people collecting clothes: six from Ohio (Ohio sent a fifty-four foot truck full of clothing - before compression); thirteen from Minnesota (four from Minneapolis, three from Owatonna, four from Rochester, and two from St. Cloud); three from Michigan; four from Maine; three from Virginia. In Rochester the clothing underwent cleaning, drying, separating, and compressing.  Amina collected money to help pay for expenses in America.  Her operation managed 1100 bags in the first container.  Amina would guess that at least that many families (Somali, American, Sudanese, Muslim immigrants from all over the world) donated clothing.  Many families also gave $40 to help defray the costs.  The second shipment had 990 bags in a slightly smaller container. At the time the Government executed its search of July 9, 2009, the clothing drive had two locations. Amina was at work securing the third when "the FBI came."

During this period, Amina read of the current events in Somalia, mostly on internet websites in her native language.   It was on the Web that she first learned about the story of a Somali mother, burned all over her body after surviving shelling by Ethiopian troops—now unable to care for her children, recovering from hideous disfigurement. She was in desperate need.   In the summer of 2007, Amina was in contact with the Somali poet Abshir Ba'adaleh, who had an ex-wife in Minnesota.   Renowned for his verses, Ba'adaleh was that rarest of Somali figures: an old man of literature, from the south, whose writings had been well known to schoolchildren in the days before the country fell apart.   Amina

spoke with him on the phone regularly, and the first time they talked, she asked him if he could find the burned mother in Mogadishu, which did not take Ba'adaleh long.   Amina collected $200 for the woman, and sent it via *hawala* transfer, to support her and her children.   Soon, the poet had identified for her more families in need of help, desperate amid the war zone the south had become.   Simultaneous with developing the clothing shipping drive, Amina had an informal family maintenance and sponsorship program functioning, using *hawala* to send small sums of money to families in need, identified by her friend's ex-husband and other women in Mogadishu.

When she gave religious lessons, Amina would publicize the need for sponsors and describe the family, including many blind and disabled Somali people in need.   Ali was also receiving information from Mogadishu about orphans and destitute people.[34]   She started keeping track of the requests and trying to team up persons in the USA to sponsor the widows and orphans.   At the time of the search Amina had put Americans in touch with roughly 260 families, with the goal of sending $50.00 a month, more money for larger families, sometimes recruiting two sponsors for one family.   If the American sponsor was unable to continue to provide support, they agreed to call Amina, so she could find another sponsor.

---

[34] For example, a Mogadishu orphanage, the <u>Imam Nowee</u> facility, moved out of the ruined city to Kilometer 13, outside of town, under great duress when fighting flared up.   Trying to be move quickly, the orphanage was desperate for funds; Somalis in Minnesota sent $2000 which was used to rent a suitable house at Km 13, large enough for the dozens of children.   A similar fund-drive helped an orphanage in Afgoye, which called for help in paying for a new well, purchasing a donkey, and building a bakery.   Money to help them was sent from Maine, Canada, and Owatana, MN, with the hope of making the orphanage self-reliant.   Ultimately, enrollment there grew from 260 to 400 children. Maine was to send $350 a month.

By the fall of 2008, she had shifted her efforts mostly to fund-raising money, in conjunction with Somali women in Dubai and Mogadishu, for disbursement within networks of charity groups in the south.   While the charity networks were southern in origin, and opposed to the TFG and its Ethiopian backers, her fundraising helped the poor, the dispossessed, and the wounded all alike, with these efforts dispersed via social service activists on the ground there.   During the course of organizing the clothing shipments over the previous year, Amina had made contacts with people who, as it turned out, were connected to Al Shabaab, ultimately leading to Hassan Afgoye, a Somali sheikh active with the militant group in its political component.   When asked today, she describes Hassan Afgoye as a Somali she could trust, as she knew his faith would not permit him to steal from her clothing operation, just as she knew his status as a sheikh meant he would ultimately be accountable, and his status would permit access.   "I didn't really know very much about the political situation there—I didn't watch tv or read the news, except for the religious teachings.   For all I knew, they were fighting for us against the Ugandans and the Ethiopians, the Burundis who took over our country.   They were good Muslims, and I knew they wouldn't steal from me."

While the amount of money ultimately raised by Amina for transfer to Hassan Afgoye would remain essentially insignificant in any global scope—only a few thousand dollars more than the $8600 detailed in the counts of the Indictment—she deeply regrets today the cost to her family and to her community from the fallout of the investigation.   At the time Amina believed she was doing the right thing, even if it might have been against

the law. Amina believes that poor, deserving ordinary Somalis in great need benefited from her clothing drive and fund-raising, yet she now knows that a one-woman relief organization was beyond her abilities to accomplish within the rules of geo-politics.[35]

### C. Community Support for the Defendant

Letters to the Court reflect that complexity which pertained then and now, and acknowledge the unintended consequences of getting involved with the tragedy. A Somali community activist in Minneapolis, Ikar Mohamed Ikar notes in his letter, "The country of Somalia has been ravaged by conflict for over two decades now and great confusion has reigned over the true nature of some of the groups involved in the conflict, including al-Shabaab, especially for those far away from the conflict zone." (Exhibit 13). Women Against Military Madness, a Minneapolis anti-war group, notes in its letter "We also understand that the repercussions of this conviction have been widespread, affecting hundreds of Somali refugees and immigrants in Minnesota who are committed to financially supporting their family members in their homeland—as immigrants to America have done throughout most of the history of our country."[36] (Exhibit 14).

Many have considered Amina's efforts foolhardy, and many would point to her predicament today as proof, as she awaits the sentence of this Court.

---

[35] Amina is a naturalized citizen of the United States. She did not arrive here until she was an adult. She grew up in a world where violence, torture, rape, murder and corruption were everyday facts of political discourse. Counsel theorizes that she is not capable of understanding the true effect the 911 attacks had upon the American psyche. Until 911, America had not been attacked on its own shores since the War of 1812. We sat behind our oceans, safe from the world wars that decimated so much of Europe and Asia. We were able to retain our somewhat smug idealism. After the attack we reacted with a vow of vengeance; invading two countries, and continuing to claim a right to violate the national sovereignty of any country in our effort to eliminate our perceived enemies. It is clear from the intercepted calls that Amina hasn't much good to say about Bin Ladin, but she does not have the gut understanding that he and his followers are America's "Great Satan."
[36] W.A.A.M. letter is signed on behalf of its committee by Lucia Wilkes Smith.

Yet, many of those writing letters to the Court recall Amina's campaign to ship clothes to Somalia as a courageous act by one brave, ordinary woman.   Abdiweli Ibrahim, a Walmart automotive technician, recollects how "Amina started this great project which collect unwanted clothing from Somali families throughout the state with the help of community. [We'd] wash the clothing, organize it and made it ready for shipment." (Exhibit 15).   Mohamed Heban recalls packing donations for on the clothing drive, and "thinking at the time how kindhearted it was of her . . . to help those who need it the most: the sick, the poor, the women and children and the orphans in drought and famine-struck Somalia." (Exhibit 16).   Asha Yusuf remembers Amina helping to fold clothes with the other housewives, "giving us lectures about charity, that helping others to earn God's pleasure is best reflected in Human being." (Exhibit 17).   Sahra Sheikh, an electronics assembler at IBM in Rochester, "noticed once that she wore the same clothes and shoes every day and then I realized she had gave all of her other clothes to help the homeless, poor, sick and in many cases dying Somalis." (Exhibit 18).   These testaments and many others[37] all express the deepest admiration for her organizing skills and personal strength, while mentioning she had her own troubles at home, caring for a paralyzed elderly mother.

Still others will miss her presence in the community, and the selflessness with which she has given to the poor.   From 2004 to the time of her arrest, Amina conducted local study groups for young girls, mothers and housewives, taking note of the difficulties

---

[37] See additional letters citing the clothing drive, from Halima Farah ["She used to gather people and tell them to do it for the sake of God and to never take the fortune that we have for granted"] (Exhibit 19); Mohamed Muhumed ["That day, I was taught to care about others . . . the lesson I learned that day I owe it all to Amina Ali"] (Exhibit 20); and Abdirahman Ikar ["This was all while her own mother has been sick and Amina had been the main person responsible for her care."] (Exhibit 21).

in getting mothers or teens who couldn't drive to travel to the very few masjids in the far-flung Somali community in the Twin Cities area.   She undertook this responsibility to educate the young girls on a volunteer basis, because she identified the need.   At the informal meetings in kitchens and living rooms, with groups of girls and their mothers, she taught her students how to read Arabic in the Qu'ran, and to translate the Haditha into English or Somali—essentially, the modern equivalent for Muslims of how many Christian, would-be scholars learned Latin through reading Augustine a hundred years ago. In a group letter from almost fifty former Qu'ran students, one reads how Amina "gave all of us the opportunity to gain Islamic knowledge in the comfort for our homes, free of charge.   All of us were unable to attend Islamic schools for different reasons . . . and could not afford to seek knowledge." (Exhibit 22).   Abdi Osman notes that Amina "was encouraging our young children that to obey their parents and [be] nice to their neighbor and all elders," (Exhibit 23), while Anisa Omar (Exhibit 24) and Shukriya Abdi (Exhibit 25) write that Amina "has been a teacher to people of all ages, she has taught us the Holy Quran, Translation of the Holy Quran, 40 Hadith and the importance of our religion." Fadumo Seed reports "She was a wonderful teacher." (Exhibit 26). Hamdi Nur writes, "Honestly, I feel truly blessed to have met her . . . She was like an advisor for the girls in the mosque . . . sometimes I used to wonder how she did this because she had a family of her own and yet she managed to be a help." (Exhibit 27).

Nearly everyone in the community, in writing to the Court, expresses grave concern over how Amina's absence, in the event of a lengthy sentence of incarceration, will impact

her paralyzed mother and her children.   Imam Hassan Mohamud of the Minnesota Da'wah Institute in Saint Paul, in asking for the Court's leniency, notes:

> She was always bringing her children to [spiritual] lectures to build her children's life skills.   She is an exceptional daughter for her disabled mother in Rochester.   I saw her taking care of her senior and disabled mother.   She was the only daughter who was there for her mother.   Her mother will be affected by her daughter's arrest.   The mother will miss her daughter Amina Ali, the only source of proper care not because she the female caregiver but she is also the only daughter. . . .

(Exhibit 28). The Somali Community Resettlement Services, Inc., of Rochester writes a letter attaching over two dozen signatures, which acknowledges the seriousness of Amina's acts while citing "the exacerbating condition of famine and violent division in Somalia today," and begs the Court to consider "the potential devastating impact the women's imprisonment may have upon their immediate and extended families." (Exhibit 29).   Salah Mohamed notes Amina "is a daughter to her bedridden mother, and a mother to beautiful daughters, and a wife to a devastated husband—who has to be a mother and father to his daughters.   They need her now more than ever." (Exhibit 30). Mohamed J. Abdi reminds the Court that Amina "has two beautiful children and a sick mother who all depend on her for care, nurture and support."[38] (Exhibit 31).   Salah Mohamed, President of the RUMSA Islamic Center, worries over the children as well, writing, "We have seen them so down and emotionally affected by this sentencing," while beseeching the Court for leniency in imposing sentence. (Exhibit 34).

---

[38] See additional letters from Agin Muqtasid (Exhibit 32) and Khadija Mohamed (Exhibit 33).

49

Since her arrest in the events at bar, and her incarceration during part of the pendency of her sentence, Amina's husband and children have carried on as best as they can. Amina's brother, Dr. Adam, rented an apartment in Rochester for Dhuha, following Amina's remand after trial, and moved his own wife and three children to Rochester to live with Dhuha and help manage her care. He was finally able to transfer to Florida to pass her remaining days with family. She has now passed away. Amina was not to ever see her mother again after the verdict in this case.

Faisal anticipates that a long sentence of incarceration for his wife will have multiple, disastrous effects on his children, unfolding slowly over the years as they grow into maturity. Most immediately, he worries that his constantly worried focus on providing for his daughters has begun to make his job impossible—his work at the lab requires such dedication and constancy that he fears his performance is suffering. If work becomes a problem, he will suffer reduced hours and lost wages. Faisal resigns himself to hiring childcare help for his daughters, which will inevitably sharpen for them the pain and loss of their mother's absence. For the moment, he has help from a sister-in-law; yet she is close to marrying, and will likely move away in the next year. In addition, Faisal fears that he will not be up to the task of shepherding his daughters through puberty, a time when his girls must have guidance from their mother. He prays for divine help and seeks advice from the men in his community. He treasures his daughters. And he takes pride in being an American, with "twenty years as a taxpayer" in his adopted homeland.

The immigrant narrative of America is a long and storied one. Much of it has unfolded against a backdrop of war, persecution and bloodshed in distant, poorly-understood foreign lands. Many immigrants to this country continue to look to their origins with anxiety and confusion, their emotions torn between life in America, and the troubles left behind. Defeated German refugees of the 1848 revolution gathered in Milwaukee and Chicago to regroup and organize against the Prussian monarchy; Russian Narodniks met in New York City to plot attacks on the Czar and feudalism; exiled Italian patriots in New York organized workers against the House of Savoy and its aristocrat kings; Irish Fenians fund-raised in Boston for relief of families who lost their men in the 1916 uprising. Indeed, the political consciousness of new arrivals in this country is often the pivot upon which assimilation turns: one wishes for the folks back home the same freedoms found in abundance here—Roosevelt's famous Four Freedoms, most of all, if not always articulated in his terms. For many Somalis in the United States, it would be a luxury to forget the refugee camps, the shattered cities, the famine and chaos they fled, and simply be Americans. For some, like Amina Ali, to forget that origin is akin to denying God and family, and sinning against all you hold dearest. Her conviction should be measured against an otherwise praise-worthy life of faith, filial piety, honesty and service to others. In her life in the United States, she has filled many roles, from mother to working hard in warehouses, to teaching young girls their Arabic. Amina Ali has not been idle in her new land, and recognizes that her freedom here has been a gift of divine

providence.   In sixteen years in this country—save for the charges of which she stands convicted—no one has had an unfriendly word to say against her.

Guilty of supporting—however slightly—an insurgent Islamist militia pursuing power in her homeland, amidst twenty-plus years of mis-rule and civil collapse, she is stained by her association with a group branded "terrorist" by current international policy imperatives.   Surely political Islam inspires dread in the West, and especially among our domestic policy-makers, even though significant portions of the world integrate it in civil polity in some form or another—this is an uncomfortable political fact of our times.   Yet the temptation in this case is to cast a housewife such as Amina Ali as a "terrorist" for the simple fact that her essentially humanitarian acts have touched the high voltage "third rail" of our global-historical moment.   As her community in Minnesota demonstrates in its letters to the Court, people admire her for helping Somalis, even while they understand that Al Shabaab is an FTO—and the seeming dissonance in holding these two ideas simultaneously does not trouble many who know the unique facts and circumstances of this case.

In many ways, Amina Ali exemplifies the best attributes of citizenship in America—volunteerism, service and caring—and it is these qualities which we hope people will recall long after this prosecution and conviction grows dim in collective memory.   The tragedy of Somalia as a failed state has reached its final stages, with perhaps its worst years behind it, as international aid, UN and multi-national initiatives,

and political compromise bring everyone gradually to the table.[39]   Yet Amina Ali's mis-step here in the United States—an infinitesimally minor footnote to a complex conflict woven in the grand 20th century themes of colonialism, nationalism, religious history, ethnicity and civil war—should not cost her a lengthy sentence of incarceration, especially not one likely to exceed in length the endgame of this conflict itself.

Amina's wrongdoing was born from the memories of her own dangerous youth in upheaval, and from the virtues of her altruism, and it must be considered against the fullness of her life.   At heart, she will remain a woman who still has a contribution to make to her community.   The Court is entitled to review all of these factors in combination to determine an appropriate sentence.   The Court can consider age, health and employment, *United States v. Chase,* 560 F. 3d 828, 830 (8th Cir. 2009); entrepreneurial spirit, *United States v. Lamoreaux,* 422 F.3d 750, 756 (8th Cir.2005); the effect of prison on a first offender, *United States v. Baker*, 455F. 3d 987, 992 (7th Cir. 2006), *United States v. Cull*, 446 F. Supp 2d 961 (E.D. WI. 2006), the relationship between the guideline range and the maximum punishment, *United States v. Jewell* 2009 WL 1010877 (E. D. Ark 2009); the

---

[39] The prevailing intelligence suggests Al Shabaab is splintering into smaller, divided groups, as it no longer controls any significant territory other than the town of Kismayo.  *See, f*or example, Katherine Zimmerman, "Al Shabaab in Decline?" American Enterprise Institute, *Critical Threats,* May 8, 2012:   "It is true that Al Shabaab is weaker than it was one year ago.  The group has had to cede territory to the Kenyan and Ethiopian militaries now operating in Somalia and African Union peacekeepers now control nearly all of the capital, Mogadishu.  More notable is the impact of internal divisions on Al Shabaab's operations."   Afyare Abdi Elmi and Abdi Aynte, "Negotiating an End to Somalia's War with Al Shabaab," *Foreign Affairs,* February 7, 2012:   "It has long been known that some senior figures of Al Shabaab would consider negotiating with the government.  Moreover, a dialogue now could boost the unpopular TFG's image in the eyes of the Somali people who view the conflict as innately political."   David McKenzie, "Kenyan PM Wants to Take Al Shabaab Stronghold by August," *CNN,* 12 June 2012: "Kenya's prime minister has put a deadline on capturing a key military objective in Somalia, drawing a line in the sand in his country's war with Islamic militants.  'Our aim is to get to Kismayo by August,' Raila Odinga said in a meeting with foreign correspondents in Nairobi on Tuesday." Nonetheless, the present security of Somalia rests upon the acceptance of occupation by foreign troops from neighboring countries with contentious histories.

totality of the punishment, *United States v. Gardellini*, 545 F. 3d 1089 (D.C. Cir. 2008); pre-indictment rehabilitation *United States v. Shy*, 538 F3d 933, 938 (8th Cir. 2008), *Gaul*, supra 128 S. Ct at 599.   Although this was not a single incident, it is an isolated mistake from an otherwise exemplary life.   See *United States v. Hadash*, 408 F. 3d 1080, 1084 (8th Cir. 2005), *United States v. Howe*, 543 F. 3d 128, 138-139 (3d Cir. 2008).

### D. Comparative Sentencing

The Sentencing Commission statistics for similar offenses show little regard for the onerous guidelines in §2M5.3   Recent statistics from the Sentencing Commission show a substantial departure rate for offenses classified under §2M5.3.   Of 14 cases in 2011, 8 were sentenced below the guideline range.   For 2009 – 9 of 11 cases were below range. For 2008 – 4 of 14 below range.   For the most recent year the median departure was 71% for national security case classification.   The median sentence was 36 months.

### E. Recent Custody and the Bureau of Prisons

Mrs. Ali spent a few days in jail during the trial. At the conclusion of the trial her release was revoked and she was placed in custody until April 19, 2012.   The Bureau of Prisons will credit any imprisonment sentence with the time spent in jail.   However, neither Mrs. Ali nor Mrs. Hassan will receive credit for the time spent in local halfway house placement. See 18 U.S.C. § 3585(b); *Reno v. Koray,* 515 U.S. 50 (1995).   The magic words, according to the Supreme Court are "official detention."   Two people can be in the same halfway house, one in the custody of the court the other in the custody of the Bureau of Prisons. The Bureau of Prisons person will be receiving credit, the court person

will not, even if that person is confined to the facility, while the BOP inmate is on work release, or even house arrest.

Mrs. Ali's conditions of confinement were the same at the halfway house as they were in the county jail.   The differences are psychological more than physical.   Instead of the Marshal bringing her to court, she comes with her attorney. She has more control over her food content.   To the severely limited extent that she is allowed visitors, they can communicate in person, instead of over closed circuit video.   Most importantly, she can wear her traditional clothing.   However, she has no freedom of movement.   She cannot leave the premises of the halfway house.   Her telephone communication with the outside world is more constrained than it had been at the jail.   The Court should adjust its sentence by varying downward to reflect the thirteen months of the equivalent of jail-time already spent by Mrs. Ali awaiting sentencing.  See United States v. Romualdi, 101 F.3d 971 (1996), (home confinement already served may be basis for downward departure).

### F. Conclusion

World politics are complicated.   The United States recently provided material military logistical and air support to the rebels trying to overthrow the legitimately recognized government of Libya.   The United States is in the process of supplying non-weapon support to rebels trying to overthrown the legitimately recognized government of Syria.   In each case the officials of the United States Government are trying to support activities that are "unlawful under the laws of the place" they are committed; and involve the "use of any explosive, firearm, or other weapon or dangerous device…with the intent to

endanger, directly or indirectly, the safety of one or more individuals." Terroristic activity defined, 8 U.S.C. § 1182(a)(3)(B). It was just as illegal to send humanitarian aid to Somalia in 2011, during the famine, knowing it would work to aid Al Shabaab, as it was for Mrs. Ali to send aid to Somalia in 2009. Yet the United States invited the aid, stating that it would not prosecute. It was still illegal to provide aid, just no longer wrong. This is a geo-political issue, not an easy decision of right versus wrong. It is presently in the interest of the United States to cut off funding to particular groups, including Al Shabaab. Those interests change from time to time. Menachem Begin and Yasir Arafat were avowed terrorists who later were to become leaders of their countries. Historians will debate the wisdom of today's decisions with the benefit of hindsight. Nations act in what they perceive as their interests at the time. The mistake is to try to cloak pragmatic, even cynical, self interest as right or wrong. Legal and illegal is a different calculus.

There is no doubt from the evidence that Mrs. Ali was driven from the most laudable motives; love of god, love of country, a genuine desire to help those displaced by war, to feed the hungry and treat the wounded. Her goal was to harness the one trait shared by her people—their religion—to try to overcome their most debilitating internal political and ethnic divisions. She was not a radical trying to upset the apple cart. The cart had been tipped over 17 years before, and all of the apples had long since been crushed. She dreamed that the Somali people could rebuild the cart.

Mrs. Ali's motives, noble or not, do not make her actions legal. Starting in February, 2008 it was against the law to provide any humanitarian aid to the poor and

starving in Southern Somalia if it would in any way require dealing with Al Shabaab. Mrs. Ali has the right to complain of a policy that makes feeding the hungry a crime, while letting them starve be legal, but she is duty bound to keep her criticism to words only.   She did not.

Nonetheless the law requires the Court to take into consideration all of those factors, her motivation, whether the aid was for humanitarian purposes, how direct the participation of the United States in the conflict, and the ultimate harm to the United Sates by her actions.

Dated: May 1, 2013

Respectfully submitted,

**KELLEY, WOLTER & SCOTT, P.A.**

s/Daniel M. Scott
Daniel M. Scott
Attorney ID No. 98395
Attorney for Defendant
Amina Farah Ali
431 South Seventh Street
Suite 2530
Minneapolis, MN 55415
(612) 371-9090